# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV418 |
| | ) | |
| HUBERT PETERKIN, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on several motions; including Defendant Kathryn McKenzie's ("Nurse McKenzie") motion for summary judgment (Docket Entry 80), Defendant Southern Health Partners, Inc.'s ("Defendant SHP") motion for summary judgment (Docket Entry 81), Defendants Hoke County, Sheriff Hubert Peterkin, and Nachia Revels' (collectively "HCDC Defendants") motion for summary judgment (Docket Entry 85), and Plaintiff Robert Lewis's "Cross Motion[s]" for summary judgment (Docket Entries 102, 104, 106). Also before the Court are motions for extension of time to respond to Plaintiff's cross motions for summary judgment by Nurse McKenzie and Defendant SHP. (Docket Entries 120, 122). The matters have been briefed and are ripe for review. For the following reasons, Nurse McKenzie and Defendant SHP's motions for extension of time to respond to Plaintiff's cross motions for summary judgment will be granted. Moreover, the undersigned will recommend granting Nurse McKenzie's motion for summary judgment, granting

Defendant SHP's motion for summary judgment, granting HCDC Defendants' motion for summary judgment, and denying Plaintiff's cross motions for summary judgment.

## I. BACKGROUND

Plaintiff, a *pro se* prisoner, filed the instant Complaint[1] on April 17, 2019 pursuant to 42 U.S.C. § 1983 seeking monetary damages against several defendants for inadequate treatment for serious medical needs, negligence, and medical malpractice related to an eye injury while he was detained at the Hoke County Detention Center (hereinafter "HCDC") between July 8, 2015 and May 2016. (*See generally* Compl., Docket Entry 1.) Plaintiff names Sheriff Peterkin[2], Major Revels, Hoke County, Southern Health Partners, Kathryn McKenzie ("Nurse McKenzie"), and Nakia Williams[3] as defendants. (*Id.* at 16.)[4] Plaintiff asserts that Defendants' actions were in violation of the Eighth and Fourteenth Amendments (*see id.* at 36-39) and that he was also subject to negligence and medical malpractice under North Carolina law. (*Id.* at 39-41.)

Beginning early 2015, Plaintiff, a diabetic, started experiencing "a burning sensation in his eyes that gradually intensified as the months passed" while in detention at HCDC. (*Id.* at

---

[1]The undersigned notes that Plaintiff signed the Complaint under penalty of perjury, as such the undersigned will consider it as a verified complaint. *See May v. Vanlandingham*, No. 5:06CT3124, 2008 WL 2278501, at *2 (E.D.N.C. June 3, 2008) (unpublished) ("Under federal law, unsworn declarations made under penalty of perjury are generally equivalent to statements made under oath." Therefore, a plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint.) (citations omitted).

[2]The undersigned notes that Sheriff Peterkin passed away on October 13, 2021, and Sheriff Roderick C. Virgil is the current Sheriff of Hoke County. (*See* Docket Entry 101.)

[3]Plaintiff originally named a Jane Doe Defendant who during discovery has been identified as Nakia Williams. (*See* Docket Entries 59, 59-1, Text Order dated 2/1/2023.) Defendant Williams also filed an answer after the pending motions for summary judgment were filed. (*See* Docket Entry 114.)

[4]All citations in this order and recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

19.) By June 2015, Plaintiff alleges that his eyes worsened, prompting him to seek medical attention from prison officials. (*Id.*) During a sick call visit on July 8, 2015, he explained to Nurse McKenzie that his eyes were "severely strained and extremely sore, and that he had noticed some white growth matter developing near the outer edges of his left pupil." (*Id.*) Nurse McKenzie visually examined Plaintiff's eyes but did not see anything wrong with them. (*Id.* at 19-20.)

After protest from Plaintiff regarding her assessment, Nurse McKenzie had two "jailers," Corporal Atkins and Officer Campbell, look at Plaintiff's eyes. (*Id.* at 20-21.) Both stated that they saw nothing wrong with Plaintiff's eyes. (*Id.*) Plaintiff was shocked and "afraid for his health" because he knew that neither of the three individuals were medically qualified to diagnose or treat injuries related to his eyes. (*Id.* at 21.) Plaintiff then asked Nurse McKenzie if he could be seen by a doctor, and she denied this request because HCDC's "medical department does not have [a doctor]," only a physician's assistant who visits the unit once a week. (*Id.*) Nurse McKenzie further stated that even if HCDC did have a doctor, she would not allow Plaintiff to see him "because there [was] nothing wrong with [Plaintiff's] eyes." (*Id.* at 22.)

Consequently, Plaintiff filed a grievance on that same day, July 8, 2015, regarding his "denied treatment for his severe eye injury and pain." (*Id.*) Plaintiff alleges that he never received a reply, nor was he given any proof that his grievance was ever filed. (*Id.*) Therefore, Plaintiff filed a subsequent grievance on July 29, 2015, which stated that he had not received a response regarding his previous grievance and again requested that he be seen by a professional eye doctor. (*Id.* at 12, 23). According to the prison's reply to the grievance on

3

July 31, 2015, Plaintiff was instructed to "put in a sick call and go see the nurse." (*Id.* at 12.) Plaintiff alleges that the grievance was ignored by Major Revels and instead answered by a "lower-level staff member who had no authority to correct violations to Plaintiff's rights, and did not even address any of the issues Plaintiff grieved upon." (*Id.* at 23.)

On August 24, 2015, Plaintiff filed another grievance addressed to Major Revels and Defendant Peterkin stating that he was without prescription eye glasses, and, as a result, his eyes were sore and severely strained. (*Id.* at 13, 23.) Additionally, he reiterated his dissatisfaction with Nurse McKenzie's assessment of his eyes and his desire to see a professional eye doctor. (*Id.* at 13.) In response to the grievance, Major Revels stated that if Plaintiff gave her the name and location of his eye doctor, they could contact the eye doctor in reference to a new prescription or Plaintiff could have a family member bring him a pair of glasses. (*Id.* at 13, 24.) Plaintiff alleges that this response demonstrates that (1) Major Revels had the authority to instruct Nurse McKenzie to send Plaintiff to an outside doctor without being compelled to do so months later; (2) Major Revels knew HCDC had no doctor on staff and that Nurse McKenzie was not qualified to examine Plaintiff's eyes; and (3) both Major Revels and Nurse McKenzie knew that something was wrong with Plaintiff's eyes such that he required immediate treatment. (*Id.* at 24.) Plaintiff further states that Major Revel's response was focused solely on securing Plaintiff's eye glasses rather than focusing on his eye pain. (*Id.* at 25.)

Plaintiff filed two more grievances on September 1, 2015 and September 15, 2015, which restated his concerns regarding his eye condition and also mentioned that his eye issues might not have to do with the fact that he needs glasses but could be something related to his

4

diabetes. (*Id.* at 14, 25.) Plaintiff states that there was no response to his grievance, nor any immediate action taken to remedy his concerns. (*Id.* at 26.)

By this time, Plaintiff alleges that his pain was getting worse. (*Id.*) After complaining of his increasing pain "to whoever would listen," (*id.*), a jail official, Officer Pinix, took notice and spoke with Major Revels about Plaintiff's condition, and he was seen by Dr. Charles Inman at the Raeford Eye Clinic on December 15, 2015. (*Id.*) After examination, Dr. Inman informed Plaintiff that the "white growth matter near his left pupil" would not be harmful unless it began to spread into the pupil area. (*Id.* at 27.) He diagnosed Plaintiff with "chronic dry eye and chronic eye allergies" and prescribed him with an anti-inflammatory eyedrop, "Pataday," and new eyeglasses. (*Id.*) About a week later Plaintiff alleges that he was given his new eyeglasses but not the prescribed eye drops. (*Id.*)

Plaintiff inquired about his missing medication and was told that Nurse McKenzie stated that the Pataday eyedrops prescribed by Dr. Inman were not covered by Southern Health Partner's insurance. (*Id.* at 27-28.) Therefore, Plaintiff alleges that he filed another grievance addressed to Major Revels and Defendant Peterkin around mid-January 2016 regarding Nurse McKenzie's refusal to purchase Plaintiff's prescribed medication. (*Id.* at 28.) According to Plaintiff, Major Revels ignored this grievance as well. (*Id.*)

Plaintiff again confronted Nurse McKenzie about his eye issue and on February 11, 2016, Nurse McKenzie gave Plaintiff a box of "Care All" generic over-the-counter eyedrops as a substitute for the prescribed Pataday. (*Id.* at 28-29.) On the same day, Plaintiff filed his last grievance which stated that he was being denied the prescription given by Dr. Inman and that the Care All eye drops did not provide relief. (*Id.* at 15, 29.) Nakia Williams responded

5

by stating that the over-the-counter medication given to Plaintiff was approved by Dr. Inman. (*Id.* at 15, 30-31.) When Plaintiff showed Nakia Williams that the eyedrops Nurse McKenzie gave him did not contain antihistamine, Nakia Williams brushed it off as a "simple mistake," and she purchased Plaintiff over-the-counter eyedrops with antihistamine. (*Id.* at 31.)

Plaintiff tried the antihistamine eye drops but it did not relieve his pain. (*Id.* at 32.) Thus, when a new nurse, Nurse Dixon, was hired to replace Nurse McKenzie in March 2016, Plaintiff told her that his eyes were in great pain and that he never received his prescription eye drops. (*Id.*) Nurse Dixon then contacted Raeford Eye Center Clinic and scheduled Plaintiff another appointment with Dr. Inman, which took place on March 31, 2016. (*Id.*)

During the visit, Plaintiff alleged that Dr. Inman said that he never gave anyone permission to substitute the Pataday with Care All eye drops. (*Id.*) Dr. Inman then prescribed a cheaper eye drop called "Fluorometholone" for Plaintiff. (*Id.* at 33.) Plaintiff states that it took "around 3-weeks into April" for HCDC medical staff to order and bring Plaintiff the newly prescribed medication and "another 3-weeks for his eyes to heal and feel better." (*Id.*)

After this action was filed some Defendants answered, HCDC Defendants filed a motion for judgment on the pleadings (Docket Entry 27), which the Court granted in part and denied in part to the extent Plaintiff's state law negligence claim against Defendant Peterkin and Defendant Revels in their official capacity was dismissed, Plaintiff's state medical malpractice claim was dismissed, and HCDC Defendants' motion was otherwise denied. (*See* Docket Entry 39.) Subsequently, Plaintiff filed a motion for reconsideration (Docket Entry 42), which the Court denied (Docket Entry 46).

Then Nurse McKenzie, Defendant SHP, and HCDC Defendants filed motions for summary judgment and supporting briefs regarding all of Plaintiff's remaining claims. (Docket Entries 80, 81, 83, 84, 85, 86.) After the Court extended Plaintiff's time to file dispositive motions, Plaintiff filed cross-motions for summary judgment against Nurse McKenzie, Defendant SHP, and HCDC Defendants. (*See* Docket Entries 102, 104, 106.) HCDC Defendants timely responded to Plaintiff's cross motion for summary judgment. (*See* Docket Entry 111.) Nurse McKenzie and Defendant SHP responded in opposition to Plaintiff's cross-motions for summary judgment, (Docket Entries 112, 113), and thereafter filed extension motions to file said responses, (Docket Entries 120, 122). Plaintiff opposes the extension motions. (*See* Docket Entries 125, 126.)

## II. DISCUSSION[5]

### A. Nurse McKenzie and Defendant SHP's Motions for Extension of Time to Respond to Plaintiff's Cross Motions for Summary Judgment

Nurse McKenzie and Defendant SHP have filed motions, seeking a nine-day extension of time to allow their responses to Plaintiff's cross motions for summary judgment to be considered timely on the basis of excusable neglect. (*See* Docket Entries 120, 122.) Plaintiff opposes the motions. (Docket Entries 125, 126.)

By way of background, on February 1, 2023, the Court entered a Text Order granting Plaintiff until March 1, 2023 to file his dispositive motion and to file supplemental responses

---

[5]Nurse McKenzie, Defendant SHP, and HCDC Defendants contend that Plaintiff cannot present competent evidence to establish that he sustained any serious or significant injury as a result of any acts or omissions that he claims occurred during his detention at HCDC. (*See* Docket Entries 83, 84, 86.) While Nurse McKenzie, Defendant SHP, and HCDC Defendants present meritorious arguments, the undersigned finds other grounds for recommending the granting of their respective summary judgment motions, therefore there is no further need to address these arguments.

7

to Defendants' pending summary judgment motions. (Text Order dated 2/1/2023.) The Court further ordered that if Plaintiff filed a dispositive motion on his own behalf, Defendants would have twenty-one days to file a response to Plaintiff's motion. (*Id.*) On February 27, 2023, Plaintiff filed his motions for summary judgment against Nurse McKenzie, Defendant SHP, and HCDC Defendants. (*See* Docket Entries 102, 104, 106.)[6] As a result, Defendants' responses to Plaintiff's motions for summary judgment were due on March 20, 2023. However, Nurse McKenzie and Defendant SHP filed their responses to Plaintiff's motions for summary judgment on March 29, 2023. (*See* Docket Entries 112, 113.)

Local Rule 7.3(k) provides that the "failure to file a brief or response within the time specified in this rule shall constitute a waiver of the right thereafter to file such brief or response, except upon a showing of excusable neglect." *See also* Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."). Here, Nurse McKenzie and Defendant SHP did not request an extension of time until 29 days after their late responses in opposition to Plaintiff's cross motions for summary judgment were filed. (Docket Entries 120, 122.) Thus, under Federal Rule of Civil Procedure 6(b) and Local Rule 7.3(k), Nurse McKenzie and Defendant SHP have waived their right to respond to Plaintiff's summary judgment motions unless they can establish "excusable neglect."

---

[6]The undersigned notes that Plaintiff's cross motions for summary judgment were electronically entered on February 28, 2023. (*See* Docket Entries 102, 104, 106.) However, even adjusting for this date, Nurse McKenzie and Defendant SHP's responses were untimely filed per the Court's order. (*See* Text Order dated 2/1/2023.)

"[T]he Supreme Court held that the determination of excusable neglect is an equitable one, based on consideration of 'the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'" *Daye v. Potter*, 380 F.Supp.2d 718, 720-21 (M.D.N.C. 2005) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

Here, the undersigned concludes that Nurse McKenzie and Defendant SHP have established excusable neglect for the untimely filing of their responses in opposition to Plaintiff's summary judgment motions. Specifically, any prejudice to Plaintiff is minimal. The only potential prejudice is that Plaintiff's motions for summary judgment will be opposed, which is not "unfair prejudice." *See Garcia v. Navasota Indep. Sch. Dist.*, No. H–09–3892, 2010 WL 5139438 at *1 (S.D. Tex. Dec. 2, 2010) (unpublished) (noting that "[t]he fact that a substantive summary judgment motion is opposed is not unfair prejudice"). Moreover, to allow Plaintiff's motions for summary judgment to go uncontested would prevent a fair and complete opportunity for the claims and defenses of the parties to be fully adjudicated. *See Savage v. City of Twin Falls*, No. 1:13-cv-00179, 2015 WL 12681319, at *12 (D. Idaho Jan. 20, 2015) (unpublished) (recognizing that "among the purposes of Rule[] 6 . . . is the goal of a fair and complete opportunity for the claims and defenses of the parties to be fully adjudicated, even while imposing order upon the progress of a particular lawsuit").

Furthermore, as to the other excusable neglect factors, Nurse McKenzie and Defendant SHP's filings were only nine days late, such that it had no substantive impact on judicial proceedings, especially since no trial has been set. *See Peche v. Keller*, No. 1:11CV362,

2012 WL 2128095, at *7 (M.D.N.C. June 12, 2012) (unpublished) (noting that a total of 35 days elapsed between expiration of deadline and filing of motion for leave, and that other courts have deemed such period of delay "minimal"; collecting cases). Both Nurse McKenzie and Defendant SHP concede that the delay was within their control, based on their counsel's mistaken calculation of the deadline, however, "the Supreme Court has rejected a formulation of Rule 6(b) that would have required movants to be 'sufficiently blameless' in order to warrant deadline extensions." *See Paxalar Group, LLC v. Williams*, No. 3:13CV641, 2014 WL 1089738, at *2-3 (E.D. Va. Mar. 19, 2014) (unpublished). Thus, even though the delay was within Nurse McKenzie and Defendant SHP's control, there is no indication that they did not act in good faith.

Therefore, for good cause shown, Nurse McKenzie and Defendant SHP's motions for extension are granted, and Nurse McKenzie and Defendant SHP's responses in opposition to Plaintiff's cross motions for summary judgment will be considered.

### Evidence Submitted by Nurse McKenzie and Defendant SHP[7]

Nurse McKenzie stated in an affidavit that during her employment with SHP, she provided medical care to Plaintiff during his incarceration at HCDC. (Affidavit of Kathryn McKenzie ("McKenzie Aff.") ¶ 7, Docket Entry 82 at 2.) A physician assistant, Manual Maldonado, went to HCDC approximately once a week to examine patients, enter orders, and

---

[7]Nurse McKenzie also submitted Defendant SHP's objections and responses to Plaintiff's first set of interrogatories and request for production of documents. (*See* Docket Entry 83-1.) The undersigned discusses the evidence contained therein in the following section pertaining to Defendant SHP's evidence. The undersigned also notes that Nurse McKenzie's affidavit and Plaintiff's medical records were submitted in support of Defendant SHP's motion for summary judgment, as such the undersigned applies this evidence to Nurse McKenzie and Defendant SHP's motions for summary judgment.

10

review medical records. (*Id.* ¶ 8.) P.A. Maldonado was also available by telephone. (*Id.*) In October 2014, Plaintiff was booked into the HCDC, and in July 2015, Plaintiff submitted his first sick call for a complaint of "no glasses" and "blisters in eye." (*Id.* ¶¶ 9-11.) Following his sick call submission, on July 8, 2015, Nurse McKenzie evaluated Plaintiff's eyes and did not see any blisters or abnormal growth in his eye. (*Id.* ¶ 11.) In response to Plaintiff's accusations that Nurse McKenzie had vision problems after her evaluation of Plaintiff's eyes, the officer who escorted Plaintiff to medical also confirmed that he did not see any blisters or growth in Plaintiff's eyes. (*Id.*)[8] As such, Nurse McKenzie determined that no therapy was needed at that time and she advised Plaintiff to notify medical staff of any changes, which Plaintiff verbalized that he understood. (*Id.*)

In regards to Plaintiff's complaint of "no glasses," Nurse McKenzie contacted HCDC staff to retrieve his glasses, however, she was informed that Plaintiff's glasses were in the possession of the detective assigned to Plaintiff's criminal case. (*Id.* ¶¶ 12-13.) That detective later informed Nurse McKenzie that Plaintiff's glasses were held as evidence and could not be released. (*Id.*) Thereafter, on November 20, 2015, Nurse McKenzie contacted the Raeford Eye Clinic and scheduled Plaintiff an appointment for him to be seen for his complaints regarding glasses and the "white matter" in his eye. (*Id.* ¶ 13.) However, that appointment was cancelled and rescheduled for December 15, 2015 because Plaintiff had a conflicting court date. (*Id.* ¶¶ 14-15.) Following Plaintiff's appointment, eyeglasses were ordered for him and

---

[8] The undersigned notes that in the Complaint, Plaintiff alleges that Nurse McKenzie asked two HCDC officers to conduct a visual examination of Plaintiff's eyes on July 8, 2015. (*See* Compl. at 19-21.) However, Nurse McKenzie stated in her affidavit that only one other officer observed Plaintiff's eyes on July 8, 2015. (McKenzie Aff. ¶ 11.)

11

he was prescribed Pataday eye drops. (*Id.* ¶ 16.) Nurse McKenzie contacted Clinical Solutions Pharmacy to order Pataday eye drops for Plaintiff. (*Id.* ¶ 17.) On December 22, 2015, Plaintiff received the eyeglasses ordered. (*Id.* ¶ 18.)

However, on January 6, 2016, Nurse McKenzie understood that Clinical Solutions Pharmacy was unable to obtain Pataday eyedrops and suggested an over-the-counter eye drop as a replacement. (*Id.* ¶ 19.) The following day, Nurse McKenzie contacted the Raeford Eye Clinic and Dr. Inman entered a verbal, telephone order to substitute the Pataday eyedrops for an over-the-counter-allergy eyedrop. (*Id.* ¶ 20.) Thereafter, Plaintiff was provided with the over-the-counter eyedrops. (*Id.* ¶¶ 21-22.) Subsequently, Plaintiff complained that the Pataday eyedrops were not ordered and he had a follow-up appointment at the Raeford Eye Clinic. (*Id.* ¶¶ 23-24.) An additional order was entered to refill Plaintiff's eye drops for ninety days and he continued to receive the over-the-counter eyedrops throughout the remainder of Nurse McKenzie's employment with SHP. (*Id.* ¶¶ 25-26.)

Defendant McKenzie also submitted Plaintiff's medical records, which indicate that on January 7, 2016, the date of the "Physician's Order" SHP was permitted to use "OTC allergy eyedrops instead of Pataday eyedrops." (*See* Docket Entry 82-1 at 2.) Dr. Inman and Nurse McKenzie's name were written beside that order, and "progress notes" reflect Nurse McKenzie received a verbal/telephone order from Dr. Inman to substitute "OTC allergy eye" for the Pataday eyedrops. (*See id.* at 2, 4.) Also, the July 8, 2015, "Clinical Pathway/Patient Clinical Data Form" indicated that Plaintiff's pain level was "6/10," complained of "no glasses" and "blisters in eye"; however, the form noted that neither RN nor officer were able to see any blisters or anything abnormal, such that no therapy was needed, and it was signed

12

off by Nurse McKenzie and reviewed by P.A. Maldonado. (*Id.* at 5-6.) The medical records also reflect that in July 2016, Plaintiff was provided lubricating eye drops as needed for ninety days, which was signed off by P.A. Maldonado. (*Id.* at 8.)

Additionally, Nurse McKenzie provided an excerpt of Plaintiff's deposition in another case wherein he testified to information regarding this case. (*See* Docket Entry 83-2.) Specifically, he testified that he was diagnosed "as having chronic dry eye and chronic eye allergy." (*Id.* at 1.) Plaintiff also stated that during his second visit with Dr. Inman, he asked Dr. Inman if he had given the nurses permission to give him over-the-counter eyedrops as opposed to the prescription he wrote, and Dr. Inman informed Plaintiff that he had done "no such thing." (*Id.* at 4.) As of the date that deposition was taken, Plaintiff stated that he did not have pain in his eyes because he used the eyedrops. (*Id.*) Plaintiff's vision was also "weaker" than it had previously been. (*Id.* at 5.)

Defendant SHP submitted its objections and responses to Plaintiff's first set of interrogatories and request for production of documents wherein Defendant SHP responded that P.A. Maldonado went to HCDC approximately one time per week to examine patients, enter orders, and review medical records. (*See* Docket Entry 84-1 at 3.) Further, Defendant SHP indicated that P.A. Maldonado was available by telephone and supervised by Dr. Guangbin, Zeng, M.D. (*Id.*) In December 2015, medications were distributed to detainees at HCDC through Clinical Solutions Pharmacy. (*Id.* at 4.) Upon information and belief, Nurse McKenzie noted her understanding in Plaintiff's medical records that Pataday eyedrops were not available through Clinical Solutions Pharmacy, however, Plaintiff received alternative sterile lubricating eye drops throughout his incarceration at HCDC. (*Id.*) Defendant SHP

later determined that Pataday eyedrops were available from Clinical Solutions Pharmacy as of December 2015. (*Id.*)

In Defendant SHP's response in opposition to Plaintiff's "Cross-Motion for Summary Judgment In Response to [SHP's] Motion for Summary Judgment," Defendant SHP attaches a North Carolina Medical Board Licensee Information, which indicates that P.A. Maldonado is actively supervised by Doctor Zeng. (*See* Docket Entry 112-1.)[9]

### Evidence Submitted by Sheriff Peterkin, Major Revels, & Hoke County

HCDC Defendants submitted the affidavit of Defendant Revels wherein she states the following. (*See* Affidavit of Nachia Revels ("Revels Aff."), Docket Entry 86-1.) During Defendant Revels employment, HCDC's medical plan was inspected on at least an annual basis, and at no time during her service did HCDC fail any inspection by any agency regarding the medical/dental/mental health provided to detainees. (*Id.* ¶ 5.) To her knowledge, she never had any personal interaction with Plaintiff while he was detained at HCDC. (*Id.* ¶ 6.) Defendant Revels along with Defendant Peterkin and HCDC detention staff relied upon the professional medical judgment and expertise of Defendant SHP and its medical staff regarding the evaluation and care of inmates housed at HCDC. (*Id.* ¶¶ 8-9.) As such, Defendant Revels, Defendant Peterkin, and HCDC detention staff relied upon the decisions of Defendant SHP and its staff regarding medical diagnoses, prescribing medication, and determining courses of

---

[9]In Plaintiff's reply, he argues that the North Carolina Medical Board Licensee Information is "incompetent" evidence because it has not been authenticated. (*See* Docket Entry 118 at 3-4.) However, Plaintiff has not indicated why Defendant SHP needed to authenticate the licensee search information provided through the North Carolina Medical Board and the undersigned notes that such searches have been relied upon in other cases. *See e.g.*, *Sawyer v. Kijakazi*, No. 2:20CV33, 2021 WL 4220932, at *3 n.5 (E.D.N.C. Aug. 16, 2021) (unpublished) (noting the information indicated from the North Carolina Medical Board public records).

treatment. (*Id.* ¶ 8.) Moreover, it was the policy of Defendant Peterkin that the detention staff at HCDC would obey and comply with the orders, directives, and recommendations of medical care providers regarding the medical, dental, and mental health care and treatment of all inmates housed at HCDC. (*Id.* ¶ 14.)

Furthermore, Defendant Revels testified that it would have been improper and a violation of policy for HCDC officers to interfere with an inmate's receipt of medical, dental, or mental health care, or to attempt to override or countermand any orders of medical care providers regarding medical, dental, and mental health care of inmates housed at HCDC. (*Id.* ¶ 8.) Even though Defendant Revels was the Jail Administrator for HCDC, she did not have the ability to order or direct Defendant SHP's medical staff or any other medical care provider to render or not render medical care to any inmate. (*Id.* ¶ 9.)

Based on Defendant Revels' understanding, during Plaintiff's period of pretrial detention in HCDC, Defendant SHP's medical staff dispensed prescription medication to him twice a day, every day, which means that he had personal interaction with a jail nurse every single day. (*Id.* ¶ 10.) Defendant Revels was not aware of Plaintiff experiencing a medical emergency or any serious medical condition that was not being appropriately addressed while he was detained at HCDC, nor was she aware that any medical attention provided to Plaintiff by Defendant SHP was inadequate. (*Id.* ¶¶ 10, 15.) Defendant Revels further explains that she does not recall receiving Plaintiff's grievance on July 8, 2015, as such she could not have responded to a grievance that she never received. (*Id.* ¶ 11.) Moreover, Defendant Revels reviewed several grievances submitted by Plaintiff, and stated that the grievance dated July 29, 2015, September 15, 2015, in mid-January 2016, and February 11, 2016, did not reach her, and

noted that even though an inmate may write "Major Revels and Defendant Peterkin" at the top of the grievance, it does not mandate that the Sheriff or the Jail Administrator must personally review and address the grievance if it can be addressed at a lower level. (*Id.* ¶¶ 11, 12.) The grievance policy at HCDC was designed to address inmate grievances at the lowest level practicable within the chain of command, which encompassed Defendant Revels, as the Jail Administrator, and any subordinates to whom she delegated the authority to address inmate grievances. (*Id.* ¶ 12.) Thus, to facilitate prompt responses to inmate grievances, Defendant Revels delegated to Jail Lieutenants the ability to respond and address inmate grievances at their level if possible. (*Id.*)

In regards to medical concerns, inmates are required to bring such concerns to the attention of the medical staff by submitting a sick call slip or otherwise directly interacting with Defendant SHP's medical staff. (*Id.*) Based on Plaintiff's August 24, 2015 grievance Defendant Revels interpreted Plaintiff as requesting a new pair of prescription eyeglasses. (*Id.* ¶ 12(b.)) Immediately after receiving that grievance, Defendant Revels passed it along to one of Defendant SHP's nurses and received assurances that Plaintiff's concerns were being properly addressed. (*Id.*) Thus, Defendant Revels responded to that grievance by indicating that she had spoken with medical staff and asked for information regarding Plaintiff's eye doctor, name, and location, so medical staff could contact a doctor in reference to a new prescription. (*Id.*) She also instructed Plaintiff that his family could bring him glasses with plastic frames. (*Id.*) Defendant Revels is not aware that Plaintiff responded to anyone regarding providing the information she sought in response to his grievance. (*Id.*) Additionally, Defendant Revels does not recall that Detention Officer Pinix ever spoke to her

16

about Plaintiff or any of his medical concerns. (*Id.* ¶ 13.) Lastly, Defendant Revels does not recall ever discussing any health-related issues associated with Plaintiff to Defendant Peterkin, as she had no reason to doubt that Defendant SHP was properly addressing Plaintiff's health concerns, such that Defendant Peterkin's attention and involvement was not necessary. (*Id.* ¶ 15.)

Additionally, HCDC Defendants provided an excerpt of Plaintiff's deposition in another case wherein he testified to information regarding this case.[10] (*See* Docket Entry 86-2.) Plaintiff testified that he had never interacted or spoken with Defendant Peterkin, as he had only written letters to him but had not received a response. (*Id.* at 14-15.) He also indicated that Defendant Peterkin was responsible for violating his rights due to his responsibility of overseeing the jail. (*Id.* at 15.) As to Defendant Revels, he testified that he had never spoken to her. (*Id.* at 21.)

---

[10]Plaintiff contends that HCDC Defendants' reliance on his prior deposition testimony is improper because his knowledge and understanding of the law had evolved since that deposition was taken, and that his legal theories have changed. (*See* Docket Entry 107 at 22-23.) However, HCDC Defendants argue that (1) Plaintiff's prior deposition can be considered, as it involved the same defendants, (2) pertained to medical care provided by Defendant SHP and its staff while he was detained at HCDC, (3) Plaintiff's evolution of his knowledge and legal theories is irrelevant, and (4) Federal Rule of Civil Procedure 32(a)(8) authorizes the use of his deposition. (*See* Docket Entry 111 at 22-23.) In Plaintiff's prior case, he alleged that his constitutional rights were violated by HCDC Defendants, Defendant SHP, and others, while he was a pretrial detainee at HCDC, specifying that he was denied medical care and a medical diet in connection with his diabetes. *See Lewis v. Hoke Cnty.*, 17-cv-987-WO-JLW (M.D.N.C.) (Docket Entries 2, 10.) The undersigned concludes that HCDC Defendants' use of Plaintiff's deposition is proper, given that the previous matter was related to his medical needs, specifically discussed this case in the deposition, and is used by HCDC Defendants who were involved in the prior action. *See Miwon, U.S.A., Inc. v. Crawford*, 629 F.Supp. 153, 154 n.3 (S.D.N.Y. 1985) ("Depositions taken in a prior action generally are admissible in a subsequent action if there is a substantial identity of issues and parties in the two actions.").

## Evidence Submitted by Plaintiff

In support of his cross-motions for summary judgment against all Defendants, Plaintiff submits several attachments, including Defendant Peterkin's affidavit in a prior case, wherein he states that he had final policy making authority for HCDC and had not delegated that final policy making authority to any other individual. (*See* Affidavit of Hubert A. Peterkin ("Peterkin Aff.") ¶ 3, Docket Entry 108-2.) Defendant Peterkin did not have any personal interaction with Plaintiff during his detention at HCDC. (*Id.* ¶ 7.) Defendant Peterkin also stated that he and the detention staff at HCDC relied upon the professional medical judgment of Defendant SHP and its medical staff regarding the evaluation and care of inmates housed at HCDC. (*Id.* ¶ 8.) It was Sheriff Peterkin's policy that the detention staff at HCDC obey and comply with orders, directives, and recommendations of medical care providers regarding the medical, dental, and mental health care of all inmates at HCDC. (*Id.*) Also, during Plaintiff's detention at HCDC, Defendant Peterkin was not aware of Plaintiff having any serious medical conditions or needs that were not being appropriately addressed. (*Id.* ¶ 10.) To Defendant Peterkin's knowledge, at no time during his tenure had HCDC failed any inspection by any agency regarding the medical, dental, or mental health care provided. (*Id.*)

Plaintiff also submitted affidavits from two nurses employed by Defendant SHP during the relevant time period, who stated, *inter alia*, that on July 8, 2015, Plaintiff was seen by medical staff in response to a sick call slip he submitted, complaining of eye issues, and upon evaluation by medical staff, no abnormalities were found in Plaintiff's eyes. (*See* Docket Entries 108-3 at 3, 108-4 at 3.) The nurses also state that following Plaintiff's complaints regarding his vision and eye issues, medical staff scheduled Plaintiff an appointment to see a specialist for his eye

related complaint, and he received eyeglasses and eyedrops. (*See* Docket Entries 108-3 at 3, 4; 108-4 at 3.)

Plaintiff also submitted Nurse McKenzie's objections and responses to Plaintiff's first set of interrogatories, wherein she stated that she had spoken directly to Dr. Inman at the Raeford Eye Clinic. (*See* Docket Entry 108-6 at 1.) In her responses, she also indicated that after Dr. Inman's verbal order for over-the-counter eyedrops, she placed the order for the eyedrops from the pharmacy, and Plaintiff was promptly administered those eyedrops upon delivery. (*See id.* at 2.) Nurse McKenzie's responses also indicated that in 2015, she was a licensed registered nurse and acted within her scope in the medical evaluation and treatment of patients. (*Id.* at 4.)

Lastly, Plaintiff attached his medical records while at HCDC, which reflected the same records and notes regarding his eye related issues and care submitted by Nurse McKenzie. (*See* Docket Entry 109.) He also included a medical note indicating that on March 31, 2016, Plaintiff was still complaining of pain and redness in his eyes, that he had dry eyes and chronic allergies, and that he was prescribed over-the-counter oral antihistamines. (*Id.*)

## B. Nurse McKenzie and Defendant SHP's Motions for Summary Judgment

Nurse McKenzie contends that she is entitled to summary judgment because the undisputed evidence establishes that she did not act with deliberate indifference to a serious medical condition suffered by Plaintiff, as she provided Plaintiff adequate treatment for his medical condition. (*See* Docket Entries 80, 83.) SHP contends that it is entitled to summary judgment because Plaintiff does not and cannot identify or present evidence regarding any specific policy of SHP to support his general allegations. (*See* Docket Entries 81, 84.)

19

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248-49. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own

merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

Because Plaintiff was a pretrial detainee at the time of the events alleged in his Complaint, his claims for deliberate indifference "would be evaluated under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment standard applicable to convicted prisoners." *Shields v. Godfrey*, No. 1:18CV602, 2021 WL 512459, at *5 (M.D.N.C. Feb. 11, 2021) (unpublished) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "In practice however, the standards are the same for both pretrial detainees and convicted persons." *Id.* (citing *Brown v. Harris*, 240 F. 3d 383, 388-89 (4th Cir. 2001)); *see also Mays v. Sprinkle*, 992 F.3d 295, 300 (noting that even though a pretrial detainee's claim arises under the Fourteenth Amendment, the Fourth Circuit has traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs). As such, Plaintiff must demonstrate that Nurse McKenzie, Defendant SHP, and HCDC Defendants acted with "'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Regarding the objective component, a medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations omitted). As for the subjective component, a defendant is deliberately indifferent if he or she knew that an inmate faced a risk of harm due to a serious medical need and the defendant's "actions were insufficient to mitigate the risk of harm to the inmate arising from [that] medical need[ ]." *Id.* (emphasis and

internal quotation marks omitted); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that the official knew of and disregarded an excessive risk to inmate health or safety.") (internal quotations omitted). Additionally, the individual defendant must realize his actions were inappropriate as a result of his actual knowledge of risk to the inmate. *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). This standard is more than mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994). Thus, "[t]o find the prison officials [or health care provider's] liable, the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021); *see also Wynn v. Mundo*, 367 F. Supp.2d 832, 837 (M.D.N.C. 2005).

"A claim concerning a mere disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate" a constitutional violation to state a § 1983 claim. *Edwards v. Kanode*, No. 7:19CV324, 2022 WL 767092, at *2 (W.D. Va. Mar. 14, 2022) (unpublished). "The Constitution does not guarantee that plaintiff may receive a particular treatment but that plaintiff may receive an appropriate treatment. A correctional doctor does not violate the Constitution by merely choosing to prescribe a medication on its formulary instead of another medication not on its formulary as long as it is prescribed in accordance with medical discretion and *Estelle*." *Conrad v. Akers*, No. 7:10CV560, 2011 WL 3847017, at *9 (W.D. Va. Aug. 30, 2011) (unpublished). "[A]n 'error of judgment' on the part of prison medical staff or 'inadvertent failure to provide adequate medical care,' while perhaps sufficient to support an action for malpractice, does not constitute a constitutional deprivation redressable under § 1983." *Wynn*, 367 F.Supp.2d at 837 (citations omitted). It is also well

settled that negligence or medical malpractice are not sufficient to establish deliberate indifference. *Estelle*, 429 U.S. at 105-06. Further, "[c]laims regarding 'disagreements over medications, diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention' implicate medical judgment." *Harris v. Armstrong*, No. 3:02CV665, 2006 WL 861023, at *7 (D. Conn. Mar. 31, 2006) (unpublished). "Questions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). "Thus, the claims are at most, negligence claims involving medical malpractice and not the subject of a section 1983 action." *Walker v. Connecticut*, No. 3:06CV165, 2006 WL 1168664, at *3 (D. Conn. Apr. 25, 2006) (unpublished) (citations omitted).

"Intentional delay of (or interference with) medical treatment can also amount to deliberate indifference." *Kanode*, 2022 WL 767092, at * 3. "But [the] Fourth Circuit has held that there is 'no . . . violation unless "the delay results in some substantial harm to the patient," such as a "marked" exacerbation of the prisoner's medical condition or "frequent complaints of severe pain."'" *Id.* (citations omitted). "An inmate who contends 'that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'" *Evans v. S.L.R. Det. Ctr.*, No. 4:17CV2731, 2019 WL 1026362, at *6 (D.S.C. Jan. 24, 2019) (unpublished) (citation omitted).

Additionally, because SHP is a contracted medical provider for HCDC, the deliberate indifference standard is applicable to conduct of SHP and its employees. *Lewis v. Hoke Cnty.*, No. 1:17CV987, 2020 WL 5213929, at *10 (M.D.N.C. Sept. 1, 2020) (unpublished) (citing *West v. Atkins*, 487 U.S. 42, 55 (1998)) (explaining that a private entity which contracts with the state

23

to provide medical services acts "under color of state law"). However, "a private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, "a private corporation is not liable under § 1983 for torts committed by [its employees] when such liability is predicated solely upon a theory of *respondeat superior.*" *Id.*

Here, the undersigned concludes that there is no genuine issue of material fact because the evidence does not show that Nurse McKenzie acted with deliberate indifference to Plaintiff's eye related complaints, in other words providing him with eyeglasses and his prescribed Pataday eyedrops. First, the evidence shows that upon Plaintiff's complaint of eye related issues, Nurse McKenzie conducted an examination wherein she did not observe any blisters or abnormal growth in his eye, and when Plaintiff questioned her determination, she asked the officer who escorted Plaintiff to medical, and that officer also confirmed Nurse McKenzie's diagnosis. (*See* Docket Entries 82-1, 82-2.) As such, the evidence shows that Plaintiff had a "mere disagreement" with Nurse McKenzie regarding his diagnosis, which does not implicate a constitutional violation. *See Kanode*, 2022 WL 767092, at \*2.

Furthermore, the evidence shows that Nurse McKenzie attempted to retrieve Plaintiff's eyeglasses but was informed that his glasses were held as evidence and could not be returned. (*See* Docket Entries 82-1, 82-2.) Due to her inability to obtain his glasses, she scheduled Plaintiff for an appointment with the Raeford Eye Clinic for his glasses and complaint of "white matter" in his eye. (*Id.*) While admittedly several months passed before Plaintiff was seen by the Raeford Eye Clinic, the evidence shows that Plaintiff's glasses were ordered and

provided to Plaintiff, and Nurse McKenzie attempted to obtain Plaintiff's prescribed Pataday eyedrops. (*Id.*)

Even though Defendant SHP later determined that Pataday eyedrops were available through their respective pharmacy, during the relevant time period, Nurse McKenzie understood them to be unavailable. (*Id.*) As a result, she contacted Plaintiff's eye doctor, who authorized her to substitute over-the-counter eyedrops, and she then provided those eyedrops to Plaintiff, which is corroborated by the contemporaneous medical records taken at the time. (*Id.*) Plaintiff attempts to dispute that Dr. Inman authorized Nurse McKenzie to take such action, however, his allegations are not supported by any of the evidence. (*See* Compl. at 32, Docket Entry 83-2.) As such, Plaintiff's self-serving allegations are insufficient to create a genuine issue of material fact regarding whether Nurse McKenzie was authorized to substitute his Pataday eyedrops with over-the-counter eyedrops. *See Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015) (unpublished per curiam) (noting that "a party cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence").

While Plaintiff takes issue with the delay in receiving his glasses and eyedrops, there is no evidence indicating that Nurse McKenzie intentionally delayed Plaintiff's medical treatment, and there is no verifying medical evidence in the record to show that he suffered a detrimental effect due to the delay. Instead, Plaintiff's own allegations indicate that Dr. Inman informed him that the "white growth" developing near his left eye was not harmful and that Plaintiff suffered from chronic dry eyes and allergies, which Plaintiff confirms again in his testimony. (*See* Compl. at 19, 27; Docket Entry 83-2 at 1.) Even though Plaintiff testified that

25

his vision is "weaker," there is no verifying medical evidence to corroborate his statements. (*Id.*) Considering all of the evidence presented, it fails to show that Nurse McKenzie's treatment was so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303. Thus, Nurse McKenzie's motion for summary judgment should be granted.[11]

As to Defendant SHP, the undersigned concludes that there is no evidence, beyond Plaintiff's own speculative assertions, suggesting that a policy or custom of Defendant SHP caused any deprivation of Plaintiff's constitutional rights. Plaintiff alleges that Defendant SHP had policies that (1) prohibited medical staff from purchasing prescriptions that were not covered by Defendant SHP's insurance, like Pataday; (2) had no doctors on staff to provide adequate supervision; (3) permitted non-physician staff to perform treatments they were not trained nor licensed to provide; and (4) allowed unfit nurses to deny and delay needed treatment. (*See* Compl. at 36-38.) However, there is no evidence to support Plaintiff's speculative assertions, instead the evidence shows that P.A. Maldonado went to HCDC approximately one time per week to examine patients, enter orders, and review medical records. (*See* Docket Entries 82 ¶ 8, 84-1 at 3.) Further, P.A. Maldonado was supervised by Dr. Zeng. (*See* Docket Entry 84-1 at 3.) Additionally, there is no evidence to indicate that Defendant SHP had a policy that prohibited the ordering of prescriptions such as Pataday,

---

[11]Nurse McKenzie also argues that she is entitled to qualified immunity in her individual capacity. (*See* Docket Entry 83 at 11.) However, given that the undersigned finds other grounds for granting Nurse McKenzie's motion for summary judgment, the undersigned need not further address her arguments pertaining to qualified immunity. *See Carter v. White*, No. 6:07-3481-GRA-WMC, 2008 WL 4861648, at *3 (D.S.C. Nov. 7, 2008) (unpublished) ("A court need not address a claim for qualified immunity unless the underlying constitutional claim is first established.").

especially given that Defendant SHP determined during the course of this litigation that Pataday was actually available through the Clinical Solutions Pharmacy in December 2015. *Pronin*, 628 F. App'x at 161. Also, as stated above, the evidence does not reflect that the non-physician staff acted outside of their medical duties or intentionally delayed treatments, especially considering Nurse McKenzie's conduct. Therefore, Defendant SHP's motion for summary judgment should be granted, as there is no genuine issue of material fact that Defendant SHP had a policy or custom that caused any violation of Plaintiff's federal rights.

### C. HCDC Defendants' Motion for Summary Judgment[12]

"The Fourth Circuit Court of Appeals has held that a medical treatment claim cannot be brought against non-medical personnel unless they were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct." *Mason v. Angelone*, No. 7:01CV309, 2003 WL 23312780, at *4 (W.D. Va. Mar. 31, 2003) (unpublished). "The bottom line is that prison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." *Pulliam v. Super. of Hoke Correct.*, 1:05CV1000, 2007 WL 4180743, at *6 (M.D.N.C. Nov. 20, 2007) (unpublished).

Here, the undersigned concludes that there is no genuine issue of material fact because the evidence shows that neither Defendant Peterkin nor Defendant Revels acted with deliberate indifference regarding Plaintiff's medical care. Specifically, the evidence does not

---

[12]Defendant Peterkin and Revels also argue that they are entitled to qualified immunity. (*See* Docket Entry 86.) However, as discussed herein the undersigned recommends other grounds to grant HCDC Defendants' motion for summary judgment and will not further address qualified immunity.

suggest that either Defendant Peterkin or Defendant Revels were personally involved with any alleged delay, interfered with Plaintiff's treatment, or were indifferent to Defendant SHP's medical staff's alleged misconduct. As indicated above, the undersigned concludes that Plaintiff has failed to show that both Nurse McKenzie and Defendant SHP violated his constitutional rights. While Plaintiff alleges that he submitted grievances directly to Defendant Peterkin and Defendant Revels, as stated in their respective affidavits, these grievances were not all forwarded to them. Defendant Revels only received the August 24, 2015 grievance, which she responded to by requesting further medical information from Plaintiff, which he failed to answer. (*See* Revels Aff. ¶¶ 12, 12b.; Docket Entry 86-1.) She also passed Plaintiff's concerns to an SHP nurse who assured her that his concerns were being properly addressed. (*See id.*) As prison officials, they were entitled to rely on the medical judgments made by medical personnel regarding his eye treatment. *See Iko*, 535 F.3d at 242 (noting that a nonmedical person will generally be justified in believing that the prisoner is in capable hands). Further, Plaintiff himself admits that he had not personally spoken with either Defendant Peterkin or Defendant Revels. (*See* Docket Entries 86-1, 86-2 at 14-15, 21.) As such, there is not evidence to suggest that either Defendant Peterkin or Defendant Revels intentionally interfered with any of Plaintiff's medical treatment. Moreover, to the extent Plaintiff attempts to hold Defendants Peterkin and Defendant Revels liable based solely on their supervisory roles, such a claim fails. *See Chennault v. Mitchell*, 923 F.Supp.2d 765, 786 (E.D. Va. 2013) ("Supervisory officials are not held liable for the constitutional injuries of their subordinates under a theory of *respondeat superior*.").

28

As to the official-capacity claims against Defendant Peterkin and Defendant Revels, a plaintiff suing government officials in their official capacities, "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). However, a governmental entity is only liable if a policy or custom of that entity played a part in the violation of federal law. *Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (unpublished per curiam). In keeping with these principles, Plaintiff's official-capacity claims against Defendants Peterkin and Revels are actually claims against the Hoke County Sheriff's Office. (*See* Compl.) However, Plaintiff has proffered no facts or any evidence to suggest that the alleged violations (of which none exists) occurred as a result of a policy or custom of the Hoke County Sheriff's Office. Thus, the claims against Defendants Peterkin and Revels in their official capacities should be dismissed.

Defendant Hoke County asserts that it is entitled to summary judgment as it is not responsible for any acts or omissions on the part of the Sheriff of Hoke County or any of his employees or representatives. (*See* Compl.; Docket Entry 86 at 22-23.) The conduct of which Plaintiff complains occurred at HCDC and involves Defendant Peterkin, his deputies, and medical officials contracted by HCDC. Plaintiff contends that all of HCDC staff were employees of Hoke County. (Docket Entry 86-2 at 13-14.) However, as previously stated by the Court, Plaintiff argues that N.C. Gen. Stat. § 153A-225 applies to his claims against Hoke County.

"In North Carolina, the Office of Sheriff is a legal entity, established by the state constitution and state statutes, separate and distinct from the county because a sheriff is elected by the people, not employed by the county." *Hines v. Johnson*, No. 1:19CV515, 2020 WL

29

1516397, at *4 (M.D.N.C. Mar. 30, 2020) (unpublished). Indeed, "the sheriff has the sole statutory responsibility for the care and custody of the inmates at the county jail." *Vaught v. Ingram*, No. 5:10CT3009, 2011 WL 761482 at *4 (E.D.N.C. Feb. 24, 2011) (unpublished) (citing N.C. Gen. Stat. § 162-22). "This authority may not be delegated to another person or entity." *Id.* (citing N.C. Gen. Stat. § 162-24). However, § 153A-225, provides in pertinent part, that "each [u]nit that operates a local confinement facility shall develop a plan for providing medical care for prisoners in the facility." *Id.* at *3 (citing N.C. Gen, Stat. § 153A-225). "Under N.C. Gen. Stat. § 153A–217(7), 'unit' . . . means a county or city. Accordingly, the language of § 153A–225 appears to impose a duty upon a county to develop a plan for providing medical care," which is applicable to county jails. *Id.* (citing *State v. Wilson*, 183 N.C. App. 100, 103, 643 S.E.2d 620, 622 (2007)). Therefore, "counties in North Carolina may be held liable under § 1983 for inadequate medical care plans." *King v. Blackwood*, No. 1:21CV383, 2023 WL 4163141, at *10 (M.D.N.C. June 23, 2023), *report and recommendation adopted*, 2023 WL 4902517 (M.D.N.C. Aug. 1, 2023). Furthermore, "if the county delegates its authority to establish final policy to the Sheriff, 'the Sheriff's decisions would represent county policy and could give rise to municipal liability.'" *Id.* (citations omitted).

As such, even if Defendant Hoke County had final policy making authority over the medical plan of HCDC detainees, Plaintiff fails to present evidence suggesting that Defendant Hoke County through its own policy or custom inflicted injury on Plaintiff. *See Westmoreland v. Brown*, 883 F.Supp. 67, 78 (E.D. Va. 1995) (noting that a municipality may not be held vicariously liable under § 1983 for an injury inflicted solely by its employees or agents, but

rather only when the government's policy or custom inflicts the injury).  Therefore, the undersigned recommends dismissing Plaintiff's § 1983 claims against HCDC Defendants.

Lastly, as to Plaintiff's individual-capacity negligence claims against Defendants Peterkin and Revels, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over these state law claims, given that the undersigned recommends granting HCDC Defendants' motion for summary judgment on Plaintiff's federal claims.  *See* 28 U.S.C. § 1367 (c)(3) (the district courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction); *see also Missouri v. Spivey*, No. 4:13CV1326, 2014 WL 4349151, at *4 (D.S.C. Aug. 29, 2014) (declining to exercise supplemental jurisdiction over state law claims where summary judgment dismissed plaintiff's federal claims).

### D. <u>Plaintiff's Cross-Motions for Summary Judgment</u>

Plaintiff filed cross-motions for summary judgment against some of the named defendants, wherein he requests that the Court consider his motions as a "collective rebuttal." (*See* Docket Entry 102.)  The undersigned will now view the facts in the light most favorable to the nonmoving parties.

*i.*    *Motion for Summary Judgment Against Nurse McKenzie*

Plaintiff contends that: (1) Nurse McKenzie's affidavit contains inadmissible hearsay that precludes summary judgment in her favor; (2) Nurse McKenzie's progress notes as written in Plaintiff's medical records are "too self-serving," conclusory, and unreliable; (3) Nurse McKenzie violated Plaintiff's constitutional rights by causing him to suffer due to the delay in

31

treatment for his eye; and (4) Nurse McKenzie acted negligently under state law. (*See* Docket Entry 103.)

Here, the undersigned concludes that Plaintiff's arguments fail to establish a genuine issue of material fact or otherwise fail to show that Plaintiff is entitled to summary judgment. First, with respect to Nurse McKenzie's affidavit, Nurse McKenzie contends that the verbal order stated by Dr. Inman to substitute Pataday eyedrops with over-the-counter eyedrops is subject to an exception to the general hearsay rule pursuant to Federal Rule of Evidence 803(4). (*See* Docket Entry 113 at 2.) However, the undersigned notes that "[w]ith respect to any statement found in the medical records made by someone other than the patient, this exception does not apply." *See Francois v. Gen. Health Sys.*, 459 F.Supp.3d 710, 723 (M.D. La. 2020). "The exception contained in Federal Rule of Evidence 803(4), which permits the admission of statements made for the purposes of medical diagnoses or treatment, is limited to statements made by the person seeking medical treatment or care." *Id.* (collecting cases).

Nevertheless, Nurse McKenzie's statements in her affidavit are supported by medical records, which are admissible as evidence within the business record exception of hearsay, especially given that those records were submitted by both Plaintiff and Nurse McKenzie. *See Hutcherson v. Lim*, No. RWT8CV3044, 2013 WL 1482861, at *3 (D. Md. Apr. 9, 2013) (unpublished) ("[A] doctor's report recording his or her examination of a patient is the kind of record 'kept in the course of a regularly conducted activity of a business, organization, occupation, or calling.'" A medical provider is certainly a business within the meaning of the rule and as a result, records kept by medical providers often fit the Rule 803(6) exception and are routinely admitted); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F.Supp.3d 444, 454 (E.D.

Va. 2019) ("Medical records are quintessentially business records"). The medical records indicate that on January 7, 2016, Dr. Inman verbally ordered Nurse McKenzie to substitute Plaintiff's eyedrops. *Hutcherson v. Lim*, No. RWT8CV3044, 2013 WL 1482861, at *3 (D. Md. Apr. 9, 2013) (unpublished) ("[A] doctor's report recording his or her examination of a patient is the kind of record 'kept in the course of a regularly conducted activity of a business, organization, occupation, or calling.'" . . . A medical provider is certainly a business within the meaning of the rule and as a result, records kept by medical providers often fit the Rule 803(6) exception and are routinely admitted); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F.Supp.3d 444, 454 (E.D. Va. 2019) ("Medical records are quintessentially business records").

While Plaintiff contends that Nurse McKenzie's progress notes, written contemporaneously with the events taking place, are unreliable, he has submitted no evidence to support that assertion. Because Nurse McKenzie's progress notes included in the medical records were written contemporaneously in time with Plaintiff's medical treatment, there is no indication, as Nurse McKenzie points out, that she had any reason to believe any impending litigation would occur to give rise to an inference that Plaintiff's medical records are unreliable.[13] *See May v. Vanlandingham*, No. 5:06CT3124, 2008 WL 2278501, at *5 (E.D.N.C. June 3, 2008) (unpublished) (rejecting unreasonable inference that hospital personnel fabricated the medical records); *see also Carter-El v. Ulep*, No. 02-741, 2003 WL 23329305, at *3 n.1 (E.D. Va. Feb. 10, 2003) (unpublished) (noting that plaintiff stated defendant "falsified and fabricated medical records to make it appear as though [plaintiff] has received adequate

---

[13]Plaintiff argues that Nurse McKenzie's motivation to fabricate his medical records was based upon him questioning her vision and assessment of his eyes in July 2015. (*See* Docket Entry 117). The undersigned finds this argument unpersuasive.

33

medical care," however, plaintiff's denial of defendant's statements lacked evidentiary support). Therefore, the undersigned will consider the medical records as evidence in determining its recommendation regarding the motions for summary judgment.

As previously stated herein, there is no genuine issue of material fact as to whether Nurse McKenzie acted with deliberate indifference to Plaintiff's medical care as indicated by the evidence in the record, and Plaintiff's self-serving allegations are insufficient to withstand summary judgment. *See Pronin*, 628 F. App'x at 161. Thus, the undersigned recommends denying Plaintiff's motion for summary judgment against Nurse McKenzie.

To the extent that Plaintiff has any remaining state law negligence claims against Nurse McKenzie, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over these state law claims, given that the undersigned recommends granting Nurse McKenzie's motion for summary judgment on Plaintiff's federal claims. *See* 28 U.S.C. § 1367(c)(3) (the district courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction); *see also Missouri*, 2014 WL 4349151, at *4.

ii.    *Motion for Summary Judgment Against Defendant SHP*

Plaintiff contends, *inter alia*, that his claim against Defendant SHP is premised upon Defendant SHP not having "qualified medical staff" available to diagnose his eye condition during his July 8, 2015 medical appointment, and that he was informed that he had to purchase the Pataday eyedrops from the canteen due to it not being covered under SHP's insurance. (*See* Docket Entries 105.) He further contends that Defendant SHP's ratification of Nurse McKenzie's improper healthcare practices violated his constitutional rights; and that

34

Defendant SHP acted negligently through its ratification of Nurse McKenzie's actions. (*See id.*)

At the outset the undersigned notes that Plaintiff's contention that Defendant SHP failed to have qualified medical personnel available to address his eye related issues is unsupported by the evidence, which indicates that Defendant SHP's medical staff was comprised of registered nurses, licensed practical nurses, and a physician assistant, who was supervised by a doctor. (*See* Docket Entries 84-1, 112-1.) Next, for the reasons previously discussed, Plaintiff has not provided evidence to support his contentions that Defendant SHP had a policy to not purchase prescribed medication based on their insurance, and as a result cannot survive summary judgment. Further, his contention that Defendant SHP violated his constitutional rights by ratifying Nurse McKenzie's practices fails, given that Plaintiff has not provided evidence that Nurse McKenzie violated his constitutional rights. *See Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2011 WL 3489661, at *10 (E.D. Va. Aug. 9, 2011) (unpublished) (noting that a private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights; dismissing plaintiff's claims against private corporation because he had not alleged that any of its employees violated his constitutional rights); *cf. Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) ("As there are no underlying constitutional violations by any individual, there can be no municipal liability.").

Moreover, as to Plaintiff's remaining state law claims of negligence against Defendant SHP, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over these state law claims, given that the undersigned recommends granting

35

Defendant SHP's motion for summary judgment on Plaintiff's federal claims. *See* 28 U.S.C. § 1367(c)(3) (the district courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction); *see also Missouri*, 2014 WL 4349151, at *4. Thus, for the reasons previously discussed herein Plaintiff's § 1983 claim fails against Defendant SHP and the undersigned recommends denying Plaintiff's motion for summary judgment against Defendant SHP.

iii.     *Motion for Summary Judgment Against HCDC Defendants*

Plaintiff argues that HCDC Defendants are not entitled to summary judgment for numerous reasons relating to Defendants Peterkin and Revels fostering a custom that permitted HCDC officers to provide healthcare to detainees, instructing subordinates to ignore grievances regarding medical issues, and tacitly authorizing a delay in Plaintiff's medical treatment. (*See* Docket Entry 107.) He also contends that Defendant Peterkin's policy of "absolute deference" to the decisions of medical staff with "no exceptions" violated his rights, and that Defendants Hoke County and Peterkin violated their nondelegable duty to ensure that Defendant SHP provided adequate healthcare.[14] (*Id.*)

Here, the undersigned concludes that Plaintiff's arguments are unpersuasive and unsupported by the evidence. Specifically, Plaintiff takes issue with HCDC officers assisting Nurse McKenzie in his evaluation on July 8, 2015. However, the facts do not suggest that

---

[14]Plaintiff also argues that HCDC Defendants' reliance on Nurse McKenzie's affidavit is improper and HCDC Defendants' use of Plaintiff's deposition in a prior matter. (*See* Docket Entry 107.) However, as previously discussed herein Nurse McKenzie's statements in the affidavit are corroborated by Plaintiff's medical records, which were made contemporaneously with Plaintiff's treatment. As such HCDC Defendants' reliance on those records and Nurse McKenzie's affidavit is proper. Further, as previously stated Plaintiff's prior deposition testimony on related issues is permissible.

36

HCDC officers interfered with his medical care or otherwise violated his constitutional rights by looking at Plaintiff's eye under the direction of Nurse McKenzie, who had already evaluated Plaintiff's eye and saw no abnormal growth. The facts, further, do not suggest that HCDC officers were instructed to make medical decisions based on orders from Defendants Peterkin and Revels.

Next, Plaintiff's arguments pertaining to non-medical HCDC staff ignoring his medical related grievances are not supported by the evidence. Instead, the evidence indicates that grievances related to medical concerns are supposed to be brought to the attention of medical staff. Moreover, when Defendant Revels received one of Plaintiff's medical related grievances, she spoke with Defendant SHP staff whom she had no reason to doubt would address Plaintiff's concerns and even followed up with Plaintiff to request further information to obtain his glasses, but Plaintiff failed to respond. The record does not suggest that Nurse McKenzie was unqualified to address Plaintiff's eyes, given that she is a registered nurse.

Additionally, Plaintiff's contention that the Hoke County Sheriff's Office violated his rights by having a policy that deferred to SHP's medical staff's decisions is unavailing, given that prison officials without medical training are not responsible for determining the course of treatment or for overruling the opinions of medical professionals. *Pulliam*, 2007 WL 4180743, at *6. The evidence further does not suggest that Plaintiff was suffering from obvious signs of mistreatment, rather the evidence suggests that he was evaluated for his eye issues, saw a specialist for his eye, and was provided medication and eyeglasses for his issues. As previously stated herein, Plaintiff fails to provide evidence suggesting that Defendant SHP had a policy or custom that resulted in any violation of his constitutional rights, such that

Plaintiff's attempt to attach liability to the Hoke County Sheriff's Office and Hoke County based on Defendant SHP's actions necessarily fails.

Lastly, as to Plaintiff's arguments pertaining to his negligence claims, the undersigned recommends the Court decline to exercise supplemental jurisdiction over those claims as stated above. Thus, for the reasons previously discussed herein Plaintiff's § 1983 claims fail against HCDC Defendants and the undersigned recommends denying Plaintiff's motion for summary judgment against HCDC Defendants.

## III. CONCLUSION[15]

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendant Kathryn McKenzie's Motion for Extension of Time for her Response to Plaintiff's Cross Motion for Summary Judgment (Docket Entry 120) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Southern Health Partners, Inc.'s Motion for Extension of Time for its Response to Plaintiff's Cross Motion for Summary Judgment (Docket Entry 122) is **GRANTED**.

**IT IS HEREBY RECOMMENDED** that Defendant Kathryn McKenzie's Motion for Summary Judgment (Docket Entry 80) be **GRANTED**.

---

[15]The undersigned notes that Defendant Nakia Williams, referred to as "Jane Doe" in the Complaint, filed an answer on April 11, 2023. (*See* Docket Entry 114.) The allegations pertaining to Defendant Williams are in reference to her response to Plaintiff's grievance wherein she indicated that the over-the-counter medication given was approved by Dr. Inman, and when Plaintiff informed her of an error in those eyedrops, she remedied the issue by providing him eyedrops with antihistamine. (Compl. at 15, 30-31.) Based on the evidence in the record, the undersigned concludes that there is no genuine issue of material fact that Defendant Williams acted with deliberate indifference to Plaintiff's medical needs. The evidence indicates that she merely responded to Plaintiff's grievance by informing him that while he was prescribed Pataday, an antihistamine, he was provided an over-the-counter antihistamine, which had the same effect and was approved by the his eye care doctor. *See Hixson*, 1 F.4th at 303; *see also Wynn*, 367 F. Supp.2d at 837. As such, the undersigned recommends the Court grant summary judgment *sua sponte* in favor of Defendant Williams, as Plaintiff fails to support any claims against her. *See Moore v. Equitrans, L.P.*, 27 F.4th 211, 224 (2022) ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [])he had to come forward with all of h[is] evidence.") (citation omitted). The undersigned "is mindful that when a court considers summary judgment *sua sponte* 'it generally must give the nonmoving party sufficient notice and an opportunity to respond.'" *See Lewis v. Jordan*, No. 1:09CV21, 2011 WL 13239040, at *3 (M.D.N.C. Apr. 6, 2011) (unpublished) (citation omitted). Therefore, this recommendation should serve as Plaintiff's notice that the Court may enter summary judgment in favor of Defendant Williams and dismiss her from the action. *See e.g., Shivers v. Int'l Bhd. of Elec. Workers Local Union*, 262 F. App'x 121, 125, 127 (11th Cir. 2008) (concluding that a magistrate judge's report and recommendation that recommended granting summary judgment *sua sponte* was sufficient notice of the Court's intent to dispose of the case); *Chase v. Muniz*, No. 5:23CV23, 2023 WL 2899346, at *2 (N.D. Fla. Feb. 10, 2023), *report and recommendation adopted*, 2023 WL 2898429 (N.D. Fla. Apr. 11, 2023).

**IT IS FURTHER RECOMMENDED** that Defendant Southern Health Partners, Inc.'s Motion for Summary Judgment (Docket Entry 81) be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that Defendants Hoke County, Sheriff Hubert Peterkin, and Nachia Revels's Motion for Summary Judgment (Docket Entry 85) be **GRANTED**.

**IT IS FURTHER RECOMMENDED** that Plaintiff Lewis Peterkin's Cross Motions for Summary Judgment (Docket Entries 102, 104, 106) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that summary judgment be entered *sua sponte* in favor of Defendant Nakia Williams.

Joe L. Webster
United States Magistrate Judge

August 31, 2023
Durham, North Carolina